*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARLON DEMARIO EZELL,

        Defendant-Appellant.

UNPUBLISHED
February 28, 2019

No. 341947
Muskegon Circuit Court
LC No. 16-005834-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DARNELL LAMONT DURDEN,

        Defendant-Appellant.

No. 341949
Muskegon Circuit Court
LC No. 16-006045-FC

Before: METER, P.J., and SAWYER and CAMERON, JJ.

PER CURIAM.

In these consolidated appeals, defendants, Marlon Demario Ezell and Darnell Lamont Durden, appeal by right their jury convictions of armed robbery, MCL 750.529, and carrying or possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b, after a joint trial. The trial court sentenced Ezell as a fourth-offense habitual offender, MCL 769.12, to serve 20 to 30 years in prison for his armed robbery conviction and to serve 2 years in prison for his felony-firearm conviction, which sentence had to be served consecutively to his sentence for armed robbery. The trial court gave Ezell credit for 423 days already served. The trial court sentenced Durden as a fourth-offense habitual offender to serve 20 to 30 years in prison for his armed robbery conviction and to serve 2 years in prison for his felony-firearm conviction, which sentence had to be served consecutive to and preceding his sentence for armed robbery. The trial

court did not give him any credit for time served because Durden was on parole at the time of these offenses. The trial court also ordered Durden to serve the sentences for the present offenses after completing his sentence for the conviction for which he was on parole.

## I. BASIC FACTS

Testimony established that Kim Westerland, Kevin Westerland, Jonathan Robertson, and Paul Robertson shared a home in Muskegon, Michigan. Kim and Kevin had medical marijuana patient cards and grew marijuana in the home.

In the evening of October 23, 2016, Deshawn Brown arranged to purchase a quarter pound of marijuana from Thomas Roberts, who was an acquaintance of Kim and Kevin. Roberts arranged for Kim to sell the marijuana to Brown at Kim's home. Roberts walked to the home with Brown, and Kim let them inside. While Kim was weighing out the marijuana in the kitchen, Brown went to the door and purportedly let three other men inside. Testimony established that Ezell and Durden were two of the three men. Brown and his three companions forced the home's occupants into the kitchen at gunpoint, robbed the home of the marijuana, and took cash. Police officers arrested Brown and Ezell that night and later located Durden. The fourth participant in the robbery had not been caught by the time of trial.

## II. EZELL'S CLAIMS OF ERROR

### A. SUFFICIENCY OF THE EVIDENCE: IDENTITY

Ezell first challenges the sufficiency of the evidence at trial. This Court reviews a challenge to the sufficiency of the evidence by examining the "record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009).

On appeal, Ezell has not challenged the sufficiency of the evidence that certain persons committed a larceny of marijuana from the home at 652 Hill Avenue, that those persons used force or violence or assaulted a person who was present at the home during the larceny, or that those persons possessed a dangerous weapon during the course of committing the larceny. See *People v Gibbs*, 299 Mich App 473, 490-491; 830 NW2d 821 (2013) (stating the elements of armed robbery). He also does not challenge whether the evidence established that those persons carried or possessed a firearm during the robbery. See MCL 750.227b(1). He maintains that there was insufficient evidence to permit a reasonable jury to find beyond a reasonable doubt that he was one of those persons. See *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008) (noting that identity is an element of every offense).

Kim testified that he and his roommates were robbed by Brown and three other black men who rushed into the house after Brown let them inside. Kim admitted that he did not get a good look at the two men who went into the living room, but he was certain that Brown and an unidentified black man who was heavier set came into the kitchen and stood over them while the other two men searched the home.

Kevin's testimony matched Kim's testimony. Kevin stated that—counting Brown—four black men participated in the robbery. Two of those men came into the living room. Although Kim did not get a good look at those two men, Kevin did. Kevin testified that Ezell was one of those two men. And Kevin had good reason to recall Ezell. Kevin said that Ezell "put" a gun "toward [his] face and told [him] to move to the kitchen." Kevin identified Durden as the other man who came into the living room, and he said that Durden also had a gun and began tearing up the living room as Ezell led him into the kitchen. Kevin stated that Ezell struck him in the back of the head with his handgun because he was apparently unhappy with how slowly Kevin was moving. Kevin related that Brown and a heavy set man were in the kitchen. He also recalled that Ezell threatened to kill them if they called the police department. Kevin also identified Ezell in a corporeal lineup on the next day and identified Ezell in court. Kevin stated that he had no doubt that Ezell was one of the men who robbed him at gunpoint.

Paul's testimony was a bit unclear, but he generally testified consistently with Kim and Kevin. He stated that there were four men robbing the home, which included Brown. He said that the first man who came in after Brown went to the door was a large bearded man. The large man handed Brown a handgun and hit Paul on the head with a handgun while two other men went into the living room. Paul thought that Durden was the man who escorted Kevin to the kitchen, which was contrary to Kevin's testimony, but he agreed that Ezell was the one who threatened to kill everyone as the robbers left the home.

Although there were some discrepancies, these three witnesses agreed on several important points. All three agreed that two of the men—Brown and the heavy set man—came into the kitchen and that the two other men went into the living room. They also agreed that at least two men were armed, that the men worked in concert to steal the marijuana, and that the men used force or threats of violence to accomplish the robbery. Kim could not identify Ezell and Durden at trial, but—contrary to Ezell's suggestion on appeal—he did not testify that they were not involved. Rather, he stated that they were not the men who initially came into the kitchen. Thus, his testimony did not contradict Kevin's testimony. And Kevin emphatically identified Ezell as one of the men who came into the living room. Indeed, he stated that Ezell put a gun in his face, ordered him to the kitchen, and struck him when he moved too slowly. Paul's testimony conflicted with Kevin's as to whether Ezell escorted Kevin to the kitchen, but Paul admitted that he had been frozen with fear in the kitchen and then struck by the heavy set man before getting down on the floor. Nevertheless, he identified Durden as one of the two men who went to the living room and he testified that Ezell was the man who threatened them. Thus, two of the three robbery victims identified Durden and Ezell as coperpetrators of the armed robbery and the one who could not identify them admitted that he did not get a good look at the two men who went into the living room. For that reason, he could neither confirm nor deny whether they were the two men who went into the living room.

This testimony was—standing alone—sufficient to permit a reasonable finder of fact to find beyond a reasonable doubt that Ezell participated in the robbery and that he carried or possessed a firearm during the commission of the robbery. See MCL 750.227b(1); *Gibbs*, 299 Mich App at 490-491. As noted, there were some inconsistencies between the testimonies of Paul and Kevin with regard to the specific actions taken by Ezell during the robbery, but both men agreed that Ezell participated. A reasonable jury could find that Paul and Kevin correctly

identified Ezell as a participant, but that Kevin's account of Ezell's specific actions better described Ezell's role. That is, the jury could accept Paul's identification of Ezell as the perpetrator who threatened them all, which was consistent with Kevin's testimony, but still conclude that Paul was mistaken when he identified Durden as the man who escorted Kevin to the kitchen. See *People v Bowyer*, 108 Mich App 517, 522; 310 NW2d 445 (1981) ("It is for the jury to decide who to believe and what testimony of a particular witness to believe."). Further, a reasonable jury could infer that Kim could not identify Ezell because Ezell was one of the two men who went into the living room and not because he was not in fact present for the robbery. See *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002) (stating that it is for the fact-finder alone to "determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences"). When examined in the light most favorable to the prosecution, see *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), the victims' testimonies were together sufficient to support a finding beyond a reasonable doubt that Ezell was one of the perpetrators of the armed robbery, see *Roper*, 286 Mich App at 83.

In addition to the victims' testimonies, Brown testified at trial and identified Ezell as one of the men who assisted him in the robbery. Brown's testimony appeared at times to be implausible and was highly inconsistent with the testimonies of the victims. For example, Brown suggested that the robbery was not planned ahead of time. Indeed, he testified that he had no idea that there was going to be a robbery until Ezell appeared at the door of the home and handed him a weapon. Yet his other statements belie the purported lack of planning. Brown testified that he arranged a large marijuana purchase and used Malachi Walker's phone to do so. He further stated that Walker's close friends, Ezell and Durden, just happened along at that moment. They then showed up at the house fortuitously just as Brown was approaching the door. The other testimony and evidence further showed that the four men split up, took control of the home's occupants, searched the home for marijuana, and effected their escape in relatively short order. These statements, when considered with the other testimony and evidence, strongly suggest that the marijuana purchase was a ruse and that Brown planned the robbery with his coconspirators.

Brown also denied that there was a fourth coconspirator, despite the fact that the victims all agreed that there was a fourth perpetrator who was heavy set and stayed in the kitchen the whole time. Brown claimed that Ezell was the only one in the kitchen and that he stood over the victims while Brown and Durden searched for the marijuana. But he also stated that Ezell handed him his gun by that point. So—in his version—the unarmed Ezell stood guard over the four victims by himself while Brown and Ezell searched the living room for marijuana. Brown's testimony was so implausible in light of the victim's testimony that a reasonable jury could infer that he was lying about some of the events in order to protect the fourth perpetrator and to minimize his own culpability. But even so, the jury was not required to reject all of Brown's testimony. As this Court has recognized, even liars tell many truths, and it is for the jury to " 'sift the true from the false.' " *People v Miceli*, 35 Mich App 176, 178; 192 NW2d 335 (1971), quoting *Jewell v Kelley*, 155 Mich 301, 305; 118 NW 987 (1909). For that reason, contrary to Ezell's claims on appeal, the jury could reject Brown's recitation of Ezell's involvement to the extent that his testimony conflicted with the victims' testimonies but still find him credible with regard to his claim that Ezell did in fact participate in the robbery.

As our Supreme Court has emphasized, this Court must not interfere with the fact-finder's role in deciding the weight and credibility to give to a witness's testimony when reviewing the sufficiency of the evidence; this Court may not "determine the credibility of witnesses"—"no matter how inconsistent or vague that testimony might be." *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997). Rather, when the question is one of credibility posed by diametrically opposed versions of the events in question, courts must leave the test of credibility with the trier of fact. See *People v Lemmon*, 456 Mich 625, 646-647; 576 NW2d 129 (1998). This Court will not only defer to the jury's assessment of the weight and credibility to be afforded the various witnesses' testimonies, it must resolve all conflicts in the evidence in favor of the prosecution. See *Wolfe*, 440 Mich at 515 (stating that the reviewing courts must put the evidence that was most favorable to the prosecution together and discard the rest).

Finally, there was circumstantial evidence tending to corroborate the testimonies implicating Ezell in the robbery. Testimony showed that police officers used a canine to track the perpetrators from the home where the robbery occurred to Walker's home. When the officers arrived, they observed three men standing near a grill. After an officer ordered the men to the ground, one of the men dropped a handgun and all three tried to flee. Ezell was apprehended after fleeing to a nearby park. The officers also found a large quantity of marijuana including marijuana in jars that the evidence tended to show came from the robbery at issue. The fact that Ezell was in the company of two of the perpetrators and the stolen marijuana when the officers arrived within a relatively short time of the robbery—while in theory explainable as a coincidence—also tended to corroborate the evidence that he was a participant in the robbery. See *Hardiman*, 466 Mich at 428.

Brown's testimony that Ezell tried to bribe Brown into taking the fall for the robbery, used threats against Ezell, and coerced him into submitting a letter of retraction were also evidence that he was conscious of his guilt. See *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996) (stating that evidence that the defendant threatened a witness is admissible to prove that the defendant was conscious of his or her guilt); *People v Salsbury*, 134 Mich 537, 569; 96 NW 936 (1903) (stating that "evidence that a defendant has attempted to suppress testimony or induce perjury is admissible, and tends to show guilt"). And the evidence that he was conscious of his guilt lent credibility to Brown's identification of Ezell as a perpetrator. The testimony that Ezell tried to influence Brown also strongly undermined the credibility of Brown's letter of retraction. It was for the jury to decide the import of the evidence that Ezell tried to influence Brown's statements and testimony. See *Sholl*, 453 Mich at 740. The jury was free to reject—and apparently did reject—Brown's letter of retraction as a complete fabrication drafted at Ezell's instigation. This Court will not second guess the jury's assessment of the weight and credibility to be given the letter. See *Mehall*, 454 Mich at 6.

There was significant eyewitness testimony that identified Ezell as one of the perpetrators of the armed robbery at issue. That testimony was sufficient to allow a reasonable jury to find beyond a reasonable doubt that Ezell was one of the perpetrators of the armed robbery. See *Roper*, 286 Mich App at 83.

## B. OTHER-ACTS TESTIMONY

Ezell next argues that the trial court plainly erred by allowing Brown to testify that Ezell engaged in various other acts to prevent Brown from testifying against Ezell. In the alternative, he argues that defense counsel was ineffective for failing to object to the improper other-acts testimony.

This Court generally reviews a trial court's decision to allow the admission of evidence for an abuse of discretion. *Roper*, 286 Mich App at 90. However, because Ezell did not raise this issue before the trial court, it is unpreserved for appellate review. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). This Court reviews an unpreserved challenge to the admission of evidence for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). In order to establish a plain error that warrants relief, the defendant must show that the error was plain or obvious and affected the outcome of the lower court proceedings. *Id.*

"This Court reviews de novo, as a question of constitutional law, the determination that a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial." *People v Gioglio (On Remand)*, 296 Mich App 12, 19-20; 815 NW2d 589 (2012), vacated in part on other grounds 493 Mich 864 (2012). If the trial court made findings of fact after an evidentiary hearing, this Court reviews those findings for clear error. *Id.* at 20. When, as here, no evidentiary hearing was held, our review is limited to mistakes apparent on the record. *People v Anderson*, 322 Mich App 622, 628; 912 NW2d 607 (2018).

Generally, testimony and evidence of other acts are not admissible to prove that the defendant has bad character and that he or she acted in conformity with his or her bad character. *Roper*, 286 Mich App at 91; see also MRE 404(a) (providing generally that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith") and MRE 404(b)(1) (stating that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith"). As such, "[i]f the proponent's only theory of relevance is that the other act shows defendant's inclination to wrongdoing in general to prove that the defendant committed the conduct in question, the evidence is not admissible." *People v VanderVliet*, 444 Mich 52, 63; 508 NW2d 114 (1993). Testimony and evidence concerning other acts may, however, properly be admitted to prove something other than character, even though the testimony and evidence also implicates character. *Roper*, 286 Mich App at 92. While MRE 404(b) lists permissible uses for other-acts evidence, that list is not exhaustive. See *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000). As such, other-acts evidence may be admissible if it is relevant for any purpose other than to prove action in conformity with character. *Id.*

At trial, the prosecutor elicited testimony from Brown about several incidents in which Ezell tried to directly influence Brown to mislead police officers. Brown testified that Ezell threatened him, offered him money to take the fall for the robbery, and later caused him to draft a letter of retraction that implicated unknown persons in the crime. The prosecutor could properly present that evidence to establish that Ezell was conscious of his guilt. See *Sholl*, 453 Mich at

740; *Salsbury*, 134 Mich at 569. Because the testimony was admissible for a purpose other than to prove character and action in conformity with character, MRE 404(a) and MRE 404(b)(1) did not apply. See *Sabin*, 463 Mich at 56. Ezell has not identified any other bases for excluding the evidence. Consequently, there was no plain error, let alone plain error that affected Ezell's substantial rights. *Carines*, 460 Mich at 763.

Further, Ezell cannot show that defense counsel's failure to object to this testimony on the ground that it amounted to improper other-acts testimony constituted ineffective assistance of counsel. Defense counsel had no obligation to make a meritless objection. See *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003). Accordingly, because the testimony was admissible, defense counsel's conduct was not deficient and could not have resulted in impermissible prejudice. See *Gioglio*, 269 Mich App at 22.

## C. EZELL'S CLAIMS OF ERROR SUBMITTED UNDER STANDARD 4

Ezell also raised several claims of error in a brief that he submitted on his own behalf under Supreme Court Administrative Order No. 2004-6, Standard 4.

### 1. SUGGESTIVE IDENTIFICATION

We first address Ezell's claim that the trial court erred when it allowed testimony about Kevin's pretrial identification of Ezell at a corporeal lineup. He maintains that the identification was unduly suggestive and tainted Kevin's later identification at trial.

This Court reviews for clear error the trial court's decision whether a pretrial identification procedure was unduly suggestive. *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.). A trial court clearly errs when this Court is left with the definite and firm conviction that a mistake has been made. *Id.* However, because this claim of error is unpreserved, this Court's review is for plain error affecting Ezell's substantial rights. *Carines*, 460 Mich at 763.

An unduly suggestive pretrial identification procedure can violate a defendant's right to due process. *Kurylczyk*, 443 Mich at 302. Due process concerns arise from a pretrial identification procedure "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v New Hampshire*, 565 US 228, 239-240; 132 S Ct 716; 181 L Ed 2d 694 (2012). The defendant bears the burden to prove that an identification procedure was unduly suggestive in light of the totality of the circumstances. *Kurylczyk*, 443 Mich at 302.

On appeal, Ezell challenges Kevin's identification of him at a corporeal lineup. Ezell does not, however, argue that the makeup of the corporeal lineup was unduly suggestive, nor does he argue that the officers who conducted the lineup suggested a particular identification. Rather, he maintains that the officers conducted the lineup in a way that allowed Kevin to hear any identifications made by one of the earlier witness also brought to the lineup.

Detective Matthew Kolkema testified that he participated in the corporeal lineups held on the morning of October 25, 2016. He stated that the viewing window through which the

witnesses looked at the group of persons to be identified was in a hallway. He said that the general public could not enter the hallway from the waiting room because the door to the hall was locked. There were four witnesses there that day. The four witnesses—the two Robertsons, Roberts, and Kevin—waited in the main room before being taken to the lineup. The first witness was Roberts. An officer escorted him through the door and into the hall to look through the window at the lineup with Ezell in it. He was then brought into another room to ensure that he did not have any contact with a subsequent witness. They followed this same procedure with the next witnesses. Kolkema conceded that a witness who had already finished his viewing could possibly have heard a later witnesses' identification from the room where the witness was asked to wait. He stated, however, that a witness would not have been able to hear any identification made by a witness before he was escorted down the hall.

Ezell's claim that the officers used an unduly suggestive pretrial identification procedure with Kevin depends entirely on his contention that Kevin could have heard an earlier witness's identification of him, which in turn tainted Kevin's identification. Yet Kolkema testified that it was not possible for a witness to hear an earlier witness' identification; it was only possible that a witness who had already conducted his lineup might have heard a subsequent witness's identification. Because there was no evidence that Kevin could have heard an earlier identification, Ezell has not shown that his lineup involved any suggestive procedures. See *Kurylczyk*, 443 Mich at 302-303. There was no plain error. See *Carines*, 460 Mich at 763.

## 2. JOINT TRIAL

Ezell next argues that the trial court erred by holding a joint trial. This Court "reviews de novo a trial court's interpretation of the law or the application of a constitutional standard to uncontested facts." *People v Martin*, 271 Mich App 280, 297; 721 NW2d 815 (2006). This Court reviews a trial court's decision on whether to hold a joint or separate trial for an abuse of discretion. See *People v Etheridge*, 196 Mich App 43, 53; 492 NW2d 490 (1992). However, this Court reviews unpreserved claims of constitutional error for plain error affecting the defendant's substantial rights. *Carines*, 460 Mich at 763.

Public policy favors joint trials, and a defendant who wishes to have a separate trial must make an affirmative showing that the joint trial will prejudice his or her substantial rights. *Etheridge*, 196 Mich App at 53. On appeal, Ezell claims that the joint trial violated his right to confront the witnesses against him. See US Const, Am VI. More specifically, he maintains that the admission of Durden's statement implicated him and, because Durden exercised his right not to testify, the admission of the statement at a joint trial prejudiced his rights.

The Sixth Amendment right to confront the witnesses against an accused applies to witnesses who "bear testimony" against the accused. *People v Bruner*, 501 Mich 220, 227; 912 NW2d 514 (2018) (quotation marks and citation omitted). As our Supreme Court has observed, joint trials can present confrontation problems: "Joint trials with a single jury present a special problem. Some evidence may be admissible as to one defendant but violate a codefendant's confrontation right. When that is the case, a court must either exclude the testimony or take measures to eliminate the confrontation problem." *Id.* When a codefendant's statement "was not incriminating on its face, and became so only when linked with evidence introduced later at

trial," it is not necessary to exclude the statement. *Richardson v Marsh*, 481 US 200, 208; 107 S Ct 1702; 95 L Ed 2d 176 (1987). "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211. Thus, a statement by a defendant may be admitted at a joint trial without violating the Confrontation Clause if the statement has been redacted in such a way that it does not implicate the codefendant. See *Bruner*, 501 Mich at 227-228.

At trial, Kolkema testified that he tried to interview Durden after Durden's arrest, but Durden refused to give a statement. Kolkema, however, provided a cell phone to Durden and left the room. He then monitored Durden's activities from another room. He heard Durden make a call in which he told the other person to be "strong," "not to cry," and then said that he would take a "COBBS"[1] deal if he got the opportunity because he did not want to "do more than six years."

Although Durden's statement about a *Cobbs* deal implied that Durden was conscious of his own guilt, among other possible inferences, nothing within his statement implicated Ezell in any way. Durden did not identify Ezell and did not describe any details that might—when considered with other evidence—directly implicate Ezell in the robbery. Under these circumstances, there was nothing within the statement that could be fairly characterized as having "borne testimony against [Ezell] in any Sixth Amendment sense." *Bruner*, 501 Mich at 228. Thus, the admission of this statement did not violate Ezell's right to confront Durden.

Ezell's only basis for challenging the joint trial involved Ezell's claim that the joint trial prevented him from confronting Durden about his statement. Because Durden's statement did not involve testimony against Ezell, Ezell had no right to confront Durden. Ezell has not shown that the joint trial prejudiced his substantial rights. See *Etheridge*, 196 Mich App at 53. There was no plain error. See *Carines*, 460 Mich at 763.

### 3. IMPROPER JUDICIAL FACT-FINDING

Ezell next complains that the trial court plainly erred by scoring the sentencing guidelines using facts not found by the jury or that he admitted. However, the trial court sentenced Ezell under the now advisory sentencing guidelines as provided under the decision in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015). Because the sentencing guidelines are advisory, the trial court could make findings of fact not found by the jury without violating Ezell's rights under the Sixth Amendment, see *People v Biddles*, 316 Mich App 148, 158-161; 896 NW2d 461 (2016), and he necessarily does not qualify for a remand, see *Lockridge*, 498 Mich at 397 (stating that the remand procedures apply to sentences imposed on or before July 29, 2015).

---

[1] A *Cobbs* deal refers to a form of sentencing negotiation described in *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

The trial court did not err when it scored the sentencing variables on the basis of judicial findings of fact.

## 4.  INEFFECTIVE ASSISTANCE

Ezell finally argues that he did not receive effective assistance of counsel at trial.  "To establish a claim of ineffective assistance of counsel, the defendant must show that 'counsel's representation fell below an objective standard of reasonableness' under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "  *Gioglio*, 296 Mich App at 22, quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).  Under the first prong, defendant must identify those acts or omissions that he contends were not the result of reasonable professional judgment. *Gioglio*, 296 Mich App at 22.  The reviewing court must then determine whether the identified acts or omissions were outside the wide range of professionally competent assistance under the totality of the circumstances. *Id.*

Ezell first claims that defense counsel was ineffective for failing to strike a biased juror, or, at the very least, to further investigate the potential juror's bias.

On the first day of trial, the trial court asked 13 of the potential jurors to be seated for voir dire.  The court recorder recorded the names of those 13 potential jurors.  The trial court also admonished the other potential jurors to pay attention because they might be called if one the 13 were to be excused.  The parties then questioned the 13 potential jurors.  Thereafter, the court recorder appeared to indicate the name of a potential juror if the potential juror was one of the 13 seated for voir dire and identified the potential juror as "unknown" if not one of the 13 seated jurors.

After questioning the potential jurors for some time, Ezell's defense counsel asked the potential jurors about whether they would hold it against defendants if they chose to exercise their right not to testify.  An unknown potential juror answered, "I think that I would have a hard time believing if they're not trying to stand up for themselves."  After that colloquy, the lawyers all agreed that they did not wish to strike any of the 13 jurors for cause.  Thereafter, the parties peremptorily excused several jurors, and the trial court asked each of the subsequently called potential jurors if he or she heard all of the previously asked questions and whether the juror had heard anything that would create a problem for the juror.  The court also asked each juror if he or she could be fair and impartial.  Each of the substituted potential jurors who ended up on the jury answered affirmatively.

Ezell had the burden to prove the factual predicate for his claim of ineffective assistance of counsel.  See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).  Ezell did not meet that burden.

There is no evidence that the potential juror who expressed concern about a defendant's failure to testify was part of the original 13 potential jurors selected for voir dire.  Indeed, the fact that the potential juror was identified as "unknown" suggests that the juror was not part of the original 13 persons selected.  Further, there is no record evidence that the unknown juror

eventually replaced an excused juror. Even if the unknown potential juror did end up being selected, there is no evidence that he or she was not subsequently peremptorily excused. In the absence of evidence that the juror actually served on Ezell's jury, this Court cannot fault defense counsel for failing to further investigate or asking to excuse the juror. Ezell's defense counsel would have no need to further explore the potential juror's bias if the unknown potential juror never got selected for the jury. Likewise, there would be no need to further explore the potential juror's bias if defense counsel—or any of the other lawyers—excused the potential juror peremptorily. See *Riley*, 468 Mich at 142 (stating that defense counsel has no obligation to make a meritless request). Ezell failed to demonstrate that defense counsel's conduct of voir dire fell below an objective standard of reasonableness under prevailing professional norms or that he was prejudiced by defense counsel's failure to object. See *Gioglio*, 296 Mich App at 22.

Ezell also argues that defense counsel provided ineffective assistance by failing to object to the admission of Durden's statement about a *Cobbs* agreement because that statement implicated Ezell and Ezell did not have the opportunity to cross-examine Durden. As already discussed, Durden's statement did not amount to testimony against Ezell. Accordingly, Ezell did not have the right to confront Durden about the statement, and defense counsel cannot be faulted for failing to object on that basis. See *Riley*, 468 Mich at 142.

Ezell has not shown that defense counsel provided ineffective assistance.

### III. DURDEN'S CLAIMS OF ERROR

### A. *MIRANDA* VIOLATION

For his first claim of error on appeal, Durden argues that the trial court should have suppressed the testimony about the statements that he made on the phone after he asserted his right to remain silent. This Court reviews the trial court's factual findings underlying its decision on a motion to suppress for clear error. *People v Vaughn*, 291 Mich App 183, 188; 804 NW2d 764 (2010), vacated in part on other grounds 491 Mich 642 (2012). However, this Court reviews de novo questions of constitutional law implicated by the decision in *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). *Vaughn*, 291 Mich App at 188.

In *Miranda*, the Supreme Court of the United States recognized that there was a heightened risk of improper coercion when a suspect is subjected to a custodial interrogation. *Miranda*, 384 US at 455-456. The potential for improper coercion implicated the "Fifth Amendment right to be free from compelled self-incrimination." *Vaughn*, 291 Mich App at 188, citing *Miranda*, 384 US at 458. To protect against coercion of this nature, the interrogating officer must advise the suspect of his or her fundamental rights before conducting a custodial interrogation. *Vaughn*, 291 Mich App at 188-189. " '[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against' " the person interrogated. *Id.* at 189, quoting *Miranda*, 384 US at 479. Moreover, if the defendant asserts his or her right to remain silent in any manner, the interrogation must cease. *People v White*, 493 Mich 187, 194; 828 NW2d 329 (2013), citing *Miranda*, 384 US at 473-474. "If the police continue to 'interrogate' the defendant after he has

invoked his right to remain silent, and the defendant confesses as a result . . . , the confession is inadmissible." *White*, 493 Mich at 194, citing *Miranda*, 384 US at 444-445.

The trial court took testimony about Durden's interrogation on the second day of trial before the jury was seated. Detective Kolkema testified that he interviewed Durden at the Muskegon Police Department after Durden was taken into custody. He stated that he read Durden his rights and that Durden acknowledged those rights. Kolkema said that Durden refused to talk to him and, for that reason, he ceased questioning Durden. Kolkema could not recall if Durden asked to use his phone or whether he offered to lend his cell phone to Durden. Nevertheless, he did give Durden his cell phone and left the room. Kolkema went to another room with cameras to observe what Durden would do. Kolkema rather candidly admitted that he "[m]ore than likely [] offered" the phone to Durden "fully aware that he may say something that's to my benefit."

The trial court determined that offering Durden a cell phone did not amount to a custodial interrogation. It then wondered if the statement was even relevant. The prosecutor asserted that the recording showed that Durden called his mother; he repeatedly referred to the other party as "ma" and told her to stop crying and be strong. He then said, they "found my phone" and "I told them it was stolen." Durden then purportedly said: "If they come to me with a Cobbs of five or six years I'm taking it." The trial court determined that the statement was probative and that it was for the jury to decide whether the statement related to the charge at issue.

On appeal, there is no dispute that Durden was in custody, had been read his rights, and—in some fashion or another—asserted his right to remain silent. The only question is whether Kolkema's decision to provide Durden with a cell phone amounted to interrogation. See *White*, 493 Mich at 195. The term "interrogation" refers to both express questioning and "its functional equivalent": "that is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v Innis*, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 297 (1980). Thus, the question on appeal is whether Kolkema should have known that his offer of a cell phone to Durden was likely to lead to an incriminating response.

The Supreme Court of the United States explained that police officers cannot be held accountable for the unforeseeable results of their words and actions. *Id.* at 301-302. Additionally, the officer's underlying intent is generally not relevant; rather, the test examines whether the objective purpose of the act was to illicit an incriminating response. *White*, 493 Mich at 196. If an objective observer could plausibly conclude that the officer's remarks or actions were done for a purpose other than to elicit an incriminating response, the remarks or actions cannot be said to have been done with knowledge that the remarks or acts were likely to elicit an incriminating response. *Id.* at 201 n 4. It is not enough to show that the officer was aware that there was a possibility that the suspect may make an incriminating response, or even that the officer hoped that he would do so. See *Arizona v Mauro*, 481 US 520, 529; 107 S Ct 1931; 95 L Ed 2d 458 (1987) (rejecting the contention that sending a suspect's wife in to speak with him amounted to an interrogation because "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself").

Although Kolkema indicated that he offered Durden the phone in the hope that he might say something to Kolkema's benefit, he had no way of knowing whether Durden would in fact make an incriminating statement. Indeed, Kolkema had no way of knowing whom Durden might call and what he might say. On this record, it cannot be said that the objectively manifested purpose of the offer of a cell phone was to elicit an incriminating response and that it was done with knowledge that it would likely result in such a response. See *White*, 493 Mich at 196. Offering a phone to a suspect is not by itself the functional equivalent of an interrogation. See *Bachynski v Stewart*, 813 F3d 241, 246 (CA 6, 2015) (stating that the officer's decision to provide the suspect with a phone and phone book to call a lawyer was not the functional equivalent of an interrogation). Because Durden "was not subjected to compelling influences, psychological ploys, or direct questioning," his "volunteered statements cannot properly be considered the result of police interrogation." *Mauro*, 481 US at 529.

The trial court did not err when it determined that Durden's statements on the phone were not the result of an improper custodial interrogation made after he asserted his right to remain silent.

## B. AMENDED JUDGMENT OF SENTENCE

Durden also argues that the trial court erred when it amended his judgment of sentence on its own initiative. This Court reviews de novo whether the trial court properly interpreted and applied the court rules. See *People v Comer*, 500 Mich 278, 287; 901 NW2d 553 (2017).

In *Comer*, our Supreme Court examined the court rules that permit a trial court to correct a judgment of sentence. The Court first examined MCR 6.435, which generally governs the correction of mistakes in judgments. The Court noted that a trial court may correct a clerical mistake at any time and on its own initiative under MCR 6.435(A). By contrast, a trial court could only correct a substantive mistake before entry of judgment and after giving the parties an opportunity to be heard. *Comer*, 500 Mich at 293-294; see MCR 6.435(B). The Court then examined the court rule governing a trial court's authority to modify a sentence.

MCR 6.429(A) then provided: "A motion to correct an invalid sentence may be filed by either party. The court may correct an invalid sentence, but the court may not modify a valid sentence after it has been imposed except as provided by law."[2] The Court in *Comer* determined that the plain terms of MCR 6.429(A), when read in light of the remainder of that rule and MCR 6.435(B), established that a trial court lacked the authority to sua sponte correct an invalid sentence. Rather, trial courts could only correct an invalid sentence on the motion of one of the parties. Thus, even where the trial court imposed a sentence contrary to law, it could not correct the sentence on its own initiative under MCR 6.429, and could only correct the sentence on its

---

[2] Effective September 1, 2018, MCR 6.429(A) provides: "The court may correct an invalid sentence, on its own initiative after giving the parties an opportunity to be heard, or on motion by either party."

own initiative under MCR 6.435(A) if the mistake was clerical, not substantive. *Comer*, 500 Mich at 295-298.

At Durden's sentencing, the trial court stated that it was the sentence of the court that Durden "serve a term of two years consecutive to and preceding the offense of armed robbery," which sentences must be "consecutive to any term" that Durden was presently serving. The court also indicated that Durden was not entitled to any credit for the 390 days that he already served for either offense because he was on parole at the time. Despite providing for consecutive sentencing for both the sentence of felony-firearm and the parole offenses, the trial court signed a judgment of sentence that provided only that Durden's sentences were to be served consecutive to "any MDOC sentence currently being served."

In December 2017, the Department of Corrections notified the trial court that Durden's judgment of sentence did not provide for consecutive sentencing of his felony-firearm sentence even though MCL 750.227b required consecutive sentencing. The trial court on its own initiative amended the judgment of sentence to provide that Durden had to serve his sentence for felony-firearm consecutive to and preceding his sentence for armed robbery and that both were to be served consecutively to the sentence he was currently serving.

On appeal, Durden argues that the trial court lacked the authority to correct his sentence on its own initiative, even though the sentence was invalid, because the addition of a statutorily mandated term is a substantive correction. In each of the cases cited by Durden, our Supreme Court cited *Comer* and held that the trial court lacked the authority to add a statutorily mandated term on its own initiative because the correction was substantive and the trial court could only make a substantive correction before entry of judgment. The Court, however, did not discuss the particular facts or analyze the distinction between a clerical mistake and a substantive mistake. See *People v Luke*, 501 Mich 895 (2017); *People v Warrick*, 501 Mich 920 (2017); *People v Williams*, 501 Mich 876 (2017).

The Supreme Court similarly did not discuss the distinction between a clerical mistake that a trial court can correct on its own initiative at any time and a substantive mistake that can only be corrected before entry of judgment. Nevertheless, in rejecting the contention that the correction at issue in *Comer* involved a clerical mistake, the Court suggested that a clerical mistake includes the omission of a statutorily required term, if the trial court expressed its intent to comply with the statutory mandate at sentencing: "But the parties do not contend that the failure to sentence defendant to lifetime electronic monitoring was a clerical mistake. Nor could they—the original sentencing judge said nothing about lifetime electronic monitoring at the initial sentencing." *Comer*, 500 Mich at 293. Thus, whether MCR 6.435(A) applies does not depend solely on whether the missing term was required by statute. Rather, if the trial court clearly stated that the judgment of sentence was to include a specific term, but that term was not included in the judgment of sentence because of a clerical omission, the trial court may correct that error on its own initiative at any time under MCR 6.435(A).

In this case, the trial court clearly stated at sentencing that Durden was to serve his sentence for his felony-firearm conviction consecutive to and preceding his sentence for armed robbery, and that he was to serve both of those sentences consecutive to whatever term he was

serving for his parole violation. As such, the record shows that the omission of the consecutive sentencing term for the felony-firearm sentence from the judgment of sentence was a clerical error that the trial court could properly correct on its own initiative at any time under MCR 6.435(A). See *Comer*, 500 Mich at 293.

The trial court did not err when it amended Durden's judgment of sentence to correct the clerical error involving consecutive sentencing.

## IV. CONCLUSION

Ezell and Durden have not identified any errors that warrant relief. Consequently, we affirm in both dockets.

Affirmed.

/s/ Patrick M. Meter
/s/ David H. Sawyer
/s/ Thomas C. Cameron